UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RANDELL JOSEPH REDMOND, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-268 |
| | § | |
| UNIVERSITY OF TEXAS MEDICAL | § | |
| BRANCH HOSPITAL GALVESTON, *et* | § | |
| *al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING MOTION TO PROCEED *IN FORMA PAUPERIS*
AND DISMISSING CASE**

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Divisions (TDCJ-CID), and is currently confined at the McConnell Unit in Beeville, Texas.  He filed this § 1983 prisoner civil rights action on August 23, 2013, (D.E. 1), and sought leave to proceed *in forma pauperis* (i.f.p.) (D.E. 2).  In his original complaint, Plaintiff alleged that certain medical officials with the University of Texas Medical Branch, Correctional Managed Care (UTMB-CMC), as well as UTMB medical and TDCJ security officials at the McConnell Unit, had been, and were continuing to violate his Eighth Amendment right to be free from cruel and unusual punishment as they were deliberately indifferent to his serious medical needs.[1]  (D.E. 1).  However, Plaintiff is a "three-strikes litigant" as that term is defined in 28 U.S.C. § 1915(g), and as such, he

---

[1]  As discussed herein, Plaintiff is complaining that Defendants have ignored or have failed to treat appropriately his serious medical needs since December 2009, through the present.  (*See* D.E. 1, pp. 9-21).

has lost the privilege of proceeding i.f.p. unless he is "under imminent danger of serious physical injury." *See* 28 U.S.C. § 1915(g). Therefore, on September 4, 2013, Plaintiff's i.f.p. application was granted conditionally for the limited purpose of obtaining a copy of Plaintiff's TDCJ medical records from the Office of the Attorney General (AG), in its capacity as *Amicus Curiae,* to better evaluate Plaintiff's allegations of imminent physical injury.[2] (*See* D.E. 10, conditional grant of i.f.p. status).

## I.    Jurisdiction.

The Court has federal question jurisdiction over this action. *See* 28 U.S.C. § 1331.

## II.    Three strikes rule.

Prisoner civil rights actions are subject to the provisions of the Prison Litigation Reform Act ("PLRA"), including the three strikes rule, 28 U.S.C. § 1915(g). The three strikes rule provides that a prisoner who has had, while incarcerated, three or more actions or appeals dismissed as frivolous, malicious, or for failure to state a claim upon which relief can be granted is prohibited from bringing any more actions or appeals *in forma pauperis*. 28 U.S.C. § 1915(g); *Banos v. O'Guin*, 144 F.3d 883, 884 (5th Cir. 1998); *Adepegba v. Hammons*, 103 F.3d 383, 388 (5th Cir. 1996). The three strikes rule provides an exception permitting prisoners who are under imminent danger of physical harm to proceed without prepayment of the filing fee. *Id.*

---

[2] *See Martinez v. Aaron,* 570 F.2d 317 (10th Cir. 1978); *Cay v. Estelle*, 789 F.2d 318, 323 n. 4 (5th Cir. 1986).

### III.    Plaintiff's litigation history.

Plaintiff has had at least three prior actions dismissed as frivolous, malicious, or for failure to state a claim upon which relief can be granted.  In the Western District of Texas, San Antonio Division, Plaintiff acquired his first strike in *Redmond v. Brozowski, et al.,* Case No. 5:96-cv-342 (W.D. Tex. Mar. 11, 1998) (dismissed with prejudice as frivolous) (first strike).   While located in the Northern District of Texas, Plaintiff acquired his second strike in the Lubbock Division, *Redmond v. Harlan, et al,* Case No. 5:98-cv-303 (N.D. Tex. May 17, 1999) (damage claims for allegedly unconstitutional disciplinary conviction are unavailable and fail to state a cognizable claim under § 1983 unless or until the challenged disciplinary conviction has been reversed, set aside, or vacated) (second strike).   In the Amarillo Division of the Northern District of Texas, Plaintiff obtained his third strike in *Redmond v. Richardson, et al.,* Case No. 2:97-cv-266 (N.D. Tex., Oct. 21, 1999) (Plaintiff's allegations of deliberate indifference concerning his shoulder pain and work restrictions failed to state claims of deliberate indifference under the Eighth Amendment) (third strike).   Based on these three "strikes," Plaintiff is now barred from proceeding i.f.p. in a prisoner civil rights action unless he is in "imminent danger of serious physical injury."  *See*  28 U.S.C. § 1915(g).

The courts have stated that in order to meet the imminent danger requirement of § 1915(g), the threat must be "real and proximate."  Ciarpaglini v.Saini, 325 F.3d 328, 330 (7th Cir. 2003).  Allegations of past harm do not suffice; the harm must be imminent or occurring at the time the complaint is filed, and the complaint must refer to a "genuine emergency" where "time is pressing."  Heimerman v. Litscher, 337 F.3d 781, 782 (7th

Cir. 2003).  In passing the statute, Congress intended a safety valve to prevent impending harms, not those which had already occurred.  Abdul-Akbar v. McKelvie, 239 F.3d 307, 315 (3d Cir. 2001).

## IV.    Analysis.

In the instant lawsuit, Plaintiff is suing Defendants for deliberate indifference to his serious medical needs. (D.E. 1 at 4-5).  He claims that he is in constant pain and suffering, with undiagnosed injuries dating back to December 2009, and he contends that these injuries have worsened to the point that "urine runs down his legs because the injur[ies] went unchecked for so long."  (D.E. 1, p. 3).  Plaintiff named the following individuals as defendants: (1) Dr. Masood Ahmad, a physician at UTMB Hospital Galveston (HG); (2) Dr. Whitt, the primary medical provider at the McConnell Unit; (3) Drew Stalinsky, the McConnell Unit practice manager who is in charge of scheduling tele-med appointments and/or transportation of inmates to HG or to specialized medical units if ordered by medical personnel; (4) Dr. Karl Stein, a former McConnell Unit physician; (5) Erick Echavarry, a Physician's Assistant (PA) at the McConnell Unit; (6) Lorie Hudson, a Nurse Practitioner (NP) at the McConnell Unit; (7) Nurse Carrie Hucklebridge, a grievance investigator; (8) Nurse Elizabeth Joseph at UTMB HG; (9) Dr. Wesley T. Calvin, a physician at UTMB HG; (10) William Burgins, a UTMB grievance investigator; (11) UTMB Nurse-In-Training Judy; and (12) Numerous UTMB and TDCJ John and Jane Does.   (D.E. 1, pp. 4-5).

In response to this Court's *Martinez* order (D.E. 13), the AG produced under seal relevant portions of Plaintiff's TDCJ-CID medical records from December 2009 through

the present.  (*See* D.E. 26, Ex. B).[3]  In addition, the AG offered the Affidavit of Dr. Steven Bowers, legal coordinator for UTMB-CMC who has reviewed Plaintiff's TDCJ medical records.  (*See* D.E. 26, Ex. A).  Plaintiff's medical records are voluminous, and in his affidavit, which is quite lengthy itself, Dr. Bowers has attempted to summarize Plaintiff's medical complaints, as well as the medical treatment provided to him.  (*See* D.E. 26-1 – 26-7).  Upon review of this evidence, the Court finds there is simply ***no evidence*** that Plaintiff is in imminent danger of serious physical harm for purposes of §1915(g) to permit Plaintiff to proceed i.f.p.  To the contrary, the Court finds that Plaintiff has received, and is continuing to receive, appropriate and timely medical treatment.  Moreover, Plaintiff is advised that, even if he had the funds to bring this lawsuit such that he did not need to proceed i.f.p, the Court would be inclined to dismiss this action at §1915A screening for failure to state a claim and/or as frivolous, despite assuming Plaintiff's factual allegations as true and construing them in the light most favorable to him.

A.    **Plaintiff's medical complaints and treatment.**

On December 17, 2009, at UTMB's Hospital Galveston (HG), Plaintiff underwent percutaneous coronary intervention (PCI), more commonly referred to as coronary angioplasty with stent replacement.  (*See* DE. 26-7, pp. 98-133; *see also* D.E. 26-1. p. 3, Bowers Aff't at ¶ 4).  The procedure involved a small surgical incision in the groin area

---

[3] Due to the sheer volume of the medical records, reference to the medical records is to the Court's docket entry numbers and page numbers.  For example, Defendants' Exhibit B is comprised of D.E. 26-1, through 26-7, with a page number range.

and the insertion of a small catheter through Plaintiff's right femoral artery and up to the heart. *Id.* On December 23, 2009, Plaintiff underwent a second PCI. (*See* DE. 26-7, pp. 34-97; *see also* D.E. 26-1. p. 3, Bowers Aff't at ¶ 4). Both surgeries were successful with no complications. (D.E. 26-1, p. 3, Bowers Aff't at ¶ 4).

Nursing notes dated December 24, 2009, reflect that Plaintiff had bruising and a small lump at the catheter entry site.[4] (D.E. 26-1, p. 4). Nursing notes dated December 25, 2009 indicate: "small R (right) groin hematoma: improved tenderness and size unchanged." *Id.* In Plaintiff's discharge notes dated December 30, 2009, it was recommended that the hematoma be monitored for any increase in size. *Id.* Dr. Hulipas prescribed Plaintiff Tylenol #3 to be taken up to three times a day as needed for 7 days. *Id. (See also* D.E. 26-7, p. 66).

Plaintiff returned to the McConnell Unit, and on January 5, 2010, Plaintiff submitted a Sick Call Request (SCR) complaining of calf and groin pain. (D.E. 26-7, p. 33). On January 6, 2010, Plaintiff was seen by NP Hudson in the infirmary and, based on her examination, she referred him for liver and pulmonary function tests, scheduled him for an appointment at the Chronic Care Clinic (CCC), renewed a number of his prescriptions for Aspirin and Salsalate,[5] and submitted an expedited referral request to HG's Cardiology Clinic for a follow-up appointment. (D.E. 26-7, pp. 4-7).

---

[4] In his affidavit, Dr. Bowers testifies that it is common for a patient to experience bruising and soreness at the catheter entry site following the PCI procedure. (D.E. 26-1, p. 3, Bowers' Aff't at ¶ 4).

[5] Salsalate is a non-steroidal anti-inflammatory drug.

On January 9, 2010, Plaintiff submitted a SCR complaining about stinging and burning in his leg and requesting crutches. (D.E. 26-7, p. 1). On January 12, 2010, he was seen by an LVN who scheduled him to be seen by a provider to address his complaints. (D.E. 26-6, p. 172). On January 14, 2010, Plaintiff was seen in the infirmary and nursing notes state that Plaintiff "denie[d] any medical complaints." (D.E. 26-6, p. 169). Plaintiff was seen again the next day where he told a nurse that he was not having any problems with his leg that day, but he was instructed to submit a SCR should the burning sensation return. (D.E. 26-6, p. 167). Plaintiff was also seen by NP Hudson on January 15, 2010, but he did not complain about leg pain at that time. (D.E. 26-6, p. 165-166). He complained about chest pain and inquired about whether sexual release was medically necessary. *Id.* at 165. NP Hudson noted that Plaintiff was in "no acute distress" (NOA) and "pain not reproducible at this time." *Id.* Also, an EKG was performed and was normal, and she educated Plaintiff on taking his nitroglycerin within the guidelines. *Id.*

On February 4, 2010, Plaintiff submitted two SCRs complaining about chest pain. (D.E. 26-6, p. 142). Plaintiff was seen by Nurse Miller who noted that Plaintiff was "… in no distress …. Seen for this complaint four times in the same number of days." (D.E. 26-6, pp. 148-154). Nurse Miller scheduled Plaintiff to see NP Hudson, but Plaintiff left the clinic without seeing NP Hudson. (D.E. 26-6, pp. 142, 154).

On February 17, 2010, Plaintiff was seen by mental health services after he complained that he believed security was not treating him properly with regard to his work restrictions. (D.E. 26-6, p. 119). Plaintiff was seen by Nurse Munoz who noted

that he was returned to his cell in no acute physical distress.  (D.E. 26-6, p. 128).  He was seen again by mental health services on February 22, 2010, when he again complained about not being medically unassigned for work purposes.  (D.E. 26-6, p. 117).

On February 17, 2010, Plaintiff was seen in the infirmary by NP Hudson for complaints of worsening chest pain and his concern about having to perform any type of work.  (D.E. 26-6, pp. 83-84).  Plaintiff's vital signs were normal except for a slightly elevated blood pressure, and NP Hudson noted that he was in no acute distress. *Id.* at 83. NP Hudson increased the dosage of Plaintiff's Aspirin and Metoprolol prescriptions, gave him a medically unassigned work restriction for one month, and followed up on a request to Keith Webb seeking a referral to Plaintiff to HG Cardiology Clinic.  *Id.* at 83-84, 80.

On March 11, 2010, Plaintiff was taken to HG's Cardiology Clinic but was not seen due to unexpected large patient volume that day.  (D.E. 26-6, p. 70).  A note was entered into the record requesting he be rescheduled for the next available appointment. *Id.*  On March 17, 2010, Plaintiff submitted a SCR asking that NP Hudson extend Plaintiff's work restrictions.  (D.E. 26-6, p. 63).  NP Hudson saw Plaintiff the next day. *Id.* at 58.  NP Hudson noted that Plaintiff was in no acute distress, but she extended his medical work restriction for 30 more days.  *Id.*

On April 12, 2010, Plaintiff submitted a SCR complaining of problems breathing, stinging in his knees, right leg pain, right shoulder pain, acid reflux and a scratchy throat. (D.E. 26-6, p. 52). He also requested another extension on his medically unassigned work restriction.  *Id.*  NP Hudson saw Plaintiff the next morning, and she instructed him that he needed to begin light exercise to build up his buttocks, leg and calf muscles. *Id.* at 51.

She encouraged him to go to work to facilitate the light activity.  *Id.*  She also ordered him an albuterol inhaler and encouraged him to chew his food thoroughly.  *Id.*  She did not renew his medically unassigned work restriction.  *Id.*

On May 6, 2010, Plaintiff submitted a SCR stating: "I have been having complications & is out of inhalers."  (D.E. 26-6, p. 12).  Dr. Stein examined Plaintiff that same day for his complaints of chest pain.  *Id.* at 10-11.  Dr. Stein noted that he was concerned that "something may have happened to [Plaintiff's] stents," and that Plaintiff needed to be evaluated by HG Cardiology "soon," and that he would personally look into getting Plaintiff an appointment, which he did  *Id.* at 10.  Dr. Stein also indicated that he would check with Mr. Webb about a cardiology appointment for Plaintiff, which he did.[6] *Id.* at 3, 10.

On May 12, 2010, Plaintiff was seen in the HG Cardiology Clinic for complaints of chest pain with no record of complaints about groin pain.  (D.E. 26-1, Bowers' Aff't, at ¶14).  Additional testing was ordered.  *Id.*

On June 1, 2010, Plaintiff submitted a SCR complaining of excruciating chest pain.  (D.E. 26-5, p. 281).  However, he did not show up for his scheduled appointment the next day. *Id.* at 280.  On June 14, 2010, Plaintiff underwent a pulmonary function test "which showed the absence of any significant degree of pulmonary impairment or restrictive ventilation defect." (D.E. 26-5, p. 271).

---

[6] On May 29, 2010, Dr. Stein resigned as the McConnell Unit medical director and was not seen by Plaintiff again.  (*See* D.E. 26-1, Bowers Aff't, at ¶14).

On June 16, 2010, Plaintiff reported to the infirmary complaining of chest pain when having to climb the stairs to get to his housing assignment on 3-row.  (D.E. 26-5, p. 264).  His housing restriction was permanently changed to ground floor only.  *Id.*

On June 27, 2010, Plaintiff submitted a SCR complaining about hand pain from an old boxing injury and burning eyes.  (D.E. 26-5, p. 259).  He did not complain of leg, groin, or chest pain. *Id.* He was seen on June 30, 2010 and July 5, 2010, and diagnosed with "allergies" and prescribed Naphcon (eye drops).  (D.E. 26-5, 249, 252).

On July 12, 2010, Plaintiff was scheduled for a follow-up appointment at the HG Cardiology Clinic; however, Plaintiff refused to go to the appointment complaining that last time he was transported, he had to "pop nitroglycerin" because of the heat and humidity, and he suffered shoulder pain from being handcuffed to another offender.  (D.E. 26-5, p. 235).  On August 5, 2010, Plaintiff again refused to go to a scheduled appointment at the HG Cardiology Clinic.  *Id.*, p. 226.

On August 9, 2010, Plaintiff submitted a SCR asking that he be transported to HG in a van as opposed to a bus because of his "no humidity extreme" restriction.  (D.E. 26-5, p. 224).  On August 10, 2010, PA Declet met with Plaintiff and told him he was determining whether Plaintiff could be seen via DMS (telemed) instead of transporting him to HG for his cardiology appointment. *Id.* at 220.  However, according to Mr. Webb, "[c]ardiology does not see patients via DMS." *Id.* at 210.

On August 19, 2010, Plaintiff submitted a SCR complaining that his groin had "gotten worse on both sides."  (D.E. 26-5, p. 215).  On August 21, 2010, Plaintiff was examined by NP Hudson and she noted: "No visible abnormalities to groin. No pain on

palpitation.  Right back muscle next to right scapula rigid.  UA was negative." *Id.* at 213.
NP Hudson's assessment was muscular strain and groin pain.  *Id.*

On October 19, 2010, NP Hudson saw Plaintiff and encouraged him to reconsider
traveling to HG for a cardiology appointment so that his complaints of chest pain could
be further evaluated.  (D.E. 26-5, p. 172).

On December 31, 2010, Plaintiff submitted a SCR agreeing to travel to HG for a
cardiology follow-up appointment. (D.E. 26-5, p. 151).  On January 24, 2011, Plaintiff
was seen by PA Echavarry for complaints of chest pain. *Id.* at 145.  PA Echavarry
submitted a referral request for Plaintiff to be seen at the HG Cardiology Clinic.  *Id.*

On April 18, 2011, Plaintiff was seen at the HG Cardiology Clinic for chest pain.
(D.E. 26-5, pp. 101-113).  He underwent an echocardiogram for his complaints of chest
pain, but made no complaints about leg or groin pain.  *Id.*  His echocardiogram was
normal. *Id.* at 97.

On May 20, 2011, Plaintiff submitted a SCR complaining of pain in his groin.
(D.E. 26-5, p. 91).  On May 23, 2011, he was seen by PA Echavarry who noted that
Plaintiff was in no distress and that a follow-up appointment at HG Cardiology was
already pending. *Id.* at 90.

On June 7, 2011, Plaintiff was seen by Dr. Whitt for complaints of groin pain and
incontinence.  (D.E. 26-5, p. 83).  Dr. Whitt prescribed Aspirin 325 mg, twice daily.  *Id.*
at 77.

On June 20, 2012, Plaintiff was seen by Dr. Whitt for follow-up care.  (D.E. 26-5,
pp. 48-49).  Plaintiff complained about pain in his chest and testicles, and he was upset

because he had been to work in the garment factory. *Id.* at 48. Dr. Whitt assigned Plaintiff a no-walking-more-than-500-yards work restriction, but nursing notes indicate Plaintiff was upset because Dr. Whitt did not restrict Plaintiff's walking to 100 yards. *Id.* at 49. Dr. Whitt prescribed Plaintiff Nortriptyline for pain. *Id.*

On July 7, 2011, NP Hudson examined Plaintiff in response to a SCR complaining about groin pain. (D.E. 26-5, pp. 22-23). NP Hudson's assessment was possible prostatitis, urinary incontinence and neuropathy of Plaintiff's groin and right leg. *Id.* at 22. Based on this assessment, NP Hudson prescribed Plaintiff Terazosin (1 mg) for the treatment of an enlarged prostate. *Id.*

On July 12, 2011, Dr. Whitt saw Plaintiff for complaints of chest and left arm pain when exposed to cold air. (D.E. 26-5, pp. 5-6). She reviewed the results of his recent myocardial stress test, increased his nitroglycerin (Isosorbide), and gave him a permanent "sedentary work only" restriction. *Id.*

On August 10, 2011, NP Hudson saw Plaintiff in response to a SCR complaining that his Imdur (nitrate used to prevent angina attacks) was giving him headaches, body aches, and pain to his groin. (D.E. 26-4, pp. 171-172). NP Hudson explained the risks associated with not taking the Imdur, and Plaintiff decided to discontinue the medication. *Id.* Plaintiff signed a refusal of treatment form. *Id.* at 170.

On August 16, 2011, Plaintiff requested to discontinue the Nortiptyline, prescribed for his reported right groin pain. (D.E. 26-4, pp. 167-168). NP Hudson discontinued the prescription at Plaintiff's request. *Id.*

On August 23, 2011, NP Hudson saw Plaintiff for complaints of groin pain and chest pain and his desire to be medically unassigned for work. (D.E. 26-4, pp. 163-164). NP Hudson treated Plaintiff for a rash, but advised him that he should talk to Dr. Whitt concerning his other medical complaints and his work restrictions. *Id.*

On September 8, 2011, Dr. Whitt saw Plaintiff for his complaints of groin and leg pain. (D.E. 26-4, pp. 151-152). Dr. Whitt noted that Plaintiff had been evaluated at the HG Cardiology Clinic one month before and was scheduled for another cardiac catheter. *Id.* Dr. Whitt's treatment plan was to continue Plaintiff's current treatment plan pending his cardiac catheter and consider restarting his Pamelor (for treatment of depression and neuropathic pain) in one month (awaiting cooler weather). *Id.* Dr. Whitt also referred him to HG's Neurology Clinic. *Id.*

On September 28, 2011, Plaintiff underwent a heart catheterization with angioplasty at HG. (D.E. 26-4, 120-133). Upon his return to the McConnell Unit, NP Hudson submitted a referral request to the HG Cardiology Clinic for a follow-up appointment ASAP. (D.E. 26-4, p. 84).

On October 10, 2011, Plaintiff submitted a SCR complaining of chest pain. (D.E. 26-4, p. 75). Dr. Whitt saw Plaintiff the next day where he complained of chest pain in the form of a dull ache, as well as generally not feeling well and nasal congestion. *Id.* at 73-74. Dr. Whitt instructed Plaintiff not to take "cold busters" and prescribed him a nasal saline spray. *Id.* at 73.

On October 26, 2011, Plaintiff was seen at the HG Cardiology Clinic for a follow-up care of his coronary artery disease (CAD). (D.E. 26-4, pp. 24-31). He complained of

fatigue and occasional chest pressure, however, he did not complain about groin or leg pain. *Id.*

On November 2, 2011, NP Hudson performed a follow-up chart review after Plaintiff's HG Cardiology Clinic appointment. (D.E. 26-4, 12-13). NP Hudson noted that Plaintiff had been on Aspirin (325 mg) for six months and Pravachol (1 mg) for one year. *Id.* The next day, PA Echavarry saw Plaintiff for complaints of chest pain, his request to have his restrictions removed, and his request to change the time of day he took Plavix. *Id.* at 8. PA Echavarry did not remove his restrictions but did instruct him to follow-up as needed "or sooner if not better." *Id.*

On December 2, 2011, PA Echavarry saw Plaintiff for complaints of groin pain. (D.E. 26-3, pp. 243-244). PA Echavarry noted that the patient had refills on all his medications, was in no acute distress (NAD), and his "lungs clear heart normal rate and rhythm. [sic]." *Id.*

On December 28, 2011, Dr. Whitt saw Plaintiff for complaints of sharp "heart pains." (D.E. 26-3, 232-233). She noted that he was in no acute distress (NAD) with a regular heart rhythm and rate. *Id.* at 232. She increased his Prilosec and told him to return to the clinic if he was not better in one to two weeks. *Id.*

On January 10, 2012, NP Hudson submitted a referral request for HG's Cardiology Clinic for a follow-up appointment as requested by Cardiology. (*See* D.E. 26-1, Bowers Aff't at ¶ 29). On January 11, 2012, NP Hudson saw Plaintiff for complaints of chest pain and shortness of breath. (D.E. 26-3, pp. 225-226). Plaintiff also requested NP Hudson remove all of his work restrictions so that he could get a job. *Id.*

14 / 21

NP Hudson removed his work restrictions, ordered an EKG and lab work, and she renewed his prescriptions for Nitroglycerin and Pravastin. *Id.*

On February 9, 2012, Plaintiff was seen by Dr. Whitt for complaints of sharp pain and shortness of breath (SOB).  (D.E. 26-3, pp. 213-215).  Dr. Whitt gave Plaintiff a 30-day medically unassigned work restriction because he complained he only had symptoms when working in the garment factory, and she refilled his Nitroglycerin prescription. *Id.*

On February 22, 2012, Plaintiff was seen at the HG Cardiology Clinic for a follow-up appointment for his CAD.  (D.E. 26-3, p. 103).  Upon his return to the McConnell Unit, NP Hudson noted that Plaintiff had no acute needs and that his Pravastatin had been increased to 80 mg. *Id.* at 102.

On March 12, 2012, Plaintiff underwent a Dobutamine Stress Echocardiogram, following which, he was seen at HG's Cardiology Clinic on March 26, 2012. (D.E. 26-3, pp. 162-167).  On March 27, 2012, NP Hudson noted that the stress test results were non-diagnostic due to an inability to achieve the target heart rate.  *Id.* at 156.

On April 2, 2012, Plaintiff submitted a SCR complaining that he did not get the job he wanted, and, therefore, he wanted his former work restrictions put back in place. (D.E. 26-3, p. 154).  PA Echavarry saw Plaintiff the next day and told him there was no justification for reinstating certain work restrictions.  *Id.* at 153.

On April 11, 2012, Plaintiff was seen by PA Echavarry after he refused to go to HG Cardiology Clinic for a workup.  (D.D. 26-3, pp. 142-145).  PA Echavarry assessed the following restrictions: lower bunk only; ground floor only; sedentary work only; four-

hour work restriction; no walking over 500 yards; no lifting over 25 lbs; no reaching over shoulder; no repetitive use of hands; and no humidity extremes.  *Id.* at 142.

On May 18, 2012, Dr. Whitt submitted a request for Plaintiff to have a nuclear stress test at HG's Nuclear Medicine Clinic. (D.E. 26-3, pp. 113-114).  On May 24, 2012, Plaintiff refused to go to the HG appointment for the stress test.  *Id.* at 103-104.

On July 6, 2012, Dr. Whitt submitted a referral request for HG's Cardiology Clinic noting Plaintiff's CAD, unstable angina, and his refusal to undergo the nuclear stress test. (D.E. 26-1, p. 10, Bowers Aff't, ¶ 33).  The referral was returned by HG because there was no indication for a Cardiology follow-up without the stress test.  *Id.*

On July 12, 2012, Plaintiff agreed to go to HG for the stress test, and Dr. Whitt re-submitted the referral request.  (D.E. 26-3, p. 75).

On July 31, 2012, Plaintiff reported to the infirmary with complaints that he could not get to a "comfortable zone," and was examined by PA Echavarry.  (D.E. 26-3, p. 63). PA Echavarry noted that Plaintiff was in no acute distress and that his heart rate and rhythm were normal.  *Id.*  He ordered lab work and a follow-up appointment.  *Id.*  On August 16, 2012, Plaintiff had a follow-up appointment with PA Echavarry.  *Id.* at 44. Plaintiff's lab work revealed that his anemia had improved.  *Id.*

On February 5, 2013, Plaintiff submitted a SCR complaining about groin pain and that his keep-on-person (KOP) medication had been stopped requiring him to go to the pill window for his medication.  (D.E. 26-2, p. 237).  On February 6, 2013, Plaintiff was seen in the infirmary by PA Shollenbarger who noted that Plaintiff was not in any distress and the examination of his right groin area was negative/benign. *Id.* at 235-236.   PA

Shollenbarger also noted that his medication was current and that Plaintiff should alert him if his KOP medication had not been received by mid-February so that it could be re-ordered if necessary. *Id.* "It should be noted that the patient had the option to go to the pill window as needed for his medication." *Id.*

On February 11, 2013, Plaintiff was taken to the HG Cardiology Clinic for his CAD and worsening chest pain with SOB, and was seen by Dr. Ahmad and Dr. Calvin. (D.E. 26-2, pp. 125-144). Tests confirmed severe diffuse micro and macrovasular coronary disease with extensive collateralization and rapid progression, and three vessels with blockage. *Id.* Defendants ordered PCI with stent placement. *Id.* Plaintiff also advised the doctors of his right groin pain, stating that it worsened with movement and caused urinary incontinence. *Id.* Defendants noted that Plaintiff's distal pulse was intact, and they did not observe swelling. *Id.* They recommended to follow-up with neurology for evaluation of the pain. *Id.*

On February 15, 2013, Plaintiff was seen by LVN Lyles at the Darrington Unit for complaints of chest pain. (D.E. 26-2, p. 164-165). His breathing and vitals were normal, and Dr. Hulipas advised giving the patient regular Tylenol. *Id.* On February 22, 2013, upon his return to the McConnell Unit, PA Echavarry conducted a chart review, reordered Plaintiff's medications, and ordered lab work in preparation for his upcoming Chronic Care Clinic appointment. *Id.* at 157-158. On February 27, 2013, PA Echavarry saw Plaintiff for complaints of chest pain and noted Plaintiff was in no distress but did have upper respiratory congestion and a sore throat. *Id.* at 152. PA Echavarry ordered several medications and instructed Plaintiff to return as needed or sooner if not better. *Id.*

17 / 21

On March 28, 2013, PA Echavarry saw Plaintiff for pain to his right inguinal area. (D. E. 26-2, p. 111).  Plaintiff told PA Echavarry that he believed he was injured when the heart catheter was placed in via his thigh in December 2009 at HG.  *Id.*  PA Echavarry examined Plaintiff and noted that there were no inguinal hernias, and he had questionable tenderness to the right inguinal area with palpation.  *Id.*  PA Echavarry ordered an x-ray of Plaintiff's right hip which was taken on April 3, 2013.  *Id.* at 109. The x-ray revealed a small, nonspecific soft tissue calcification projecting in the medial (inside surface) right groin area.  *Id.*  According to Dr. Bowers, this is usually due to a calcified lymph-node and is a non-specific finding on an x-ray.  (D.E. 26-1. p. 11, Bowers Aff't at ¶ 36).

On April 15, 2013, Plaintiff was seen by PA Echavarry at his Chronic Care Clinic visit. (D.E. 26-2, pp. 93-103).  Based on this appointment and Plaintiff's complaint that he had suffered the injury to his groin three years prior during catheterization and had suffered urine leakage ever since, PA Echavarry submitted a referral request to HG Cardiology Clinic.  *Id.* at 85.

On July 3, 2013, Plaintiff submitted a SCR complaining about pain in his testicles. (D.E. 26-2, p. 74).  On July 5, 2013, PA Echavarry saw Plaintiff and noted that he was in no acute distress and was scheduled to be seen by HG Cardiology "in the near future." *Id.* at 72.

On August 14, 2013, Plaintiff executed his Original Complaint raising his Eighth amendment claims of deliberate indifference to his serious medical needs.  (*See* D.E. 1, p 7).

On August 26, 2013, Plaintiff was seen at the HG Cardiology Clinic.  (D.E. 26-2, pp. 56-64).  The Cardiology Clinic referred Plaintiff to HG Neurology. *Id.*

On November 14, 2013, Plaintiff requested a cane to ambulate due to his leg/groin pain.  (D.E. 26-2, p. 17).  On November 19, 2013, he was seen by Dr. Merchant-McCambry regarding his request for a cane. (D.E. 26-2, pp. 12-14).  Plaintiff complained of burning and stinging to his right leg from the hip/groin area.  *Id.*  Dr. Merchant-McCambry noted that Plaintiff had upcoming appointments at both HG Neurology and HG Cardiology, and she issued him a cane for 120 days.  *Id.*

On December 12, 2013, Plaintiff submitted a SCR complaining about testicle pain. (D.E. 26-2, p. 6).  On December 13, 2013, PA Corbett saw Plaintiff.  *Id.* at. 4-5.  PA Corbett opined that Plaintiff's hip x-ray was abnormal and that was why Plaintiff was still experiencing pain and urine leakage. *Id.* PA Corbett ordered Tylenol (325 mg) for Plaintiff's pain.  *Id.*

On February 4, 2014, Plaintiff was seen at HG's Neurology Clinic. (D.E. 26-1, p. 12, Bowers Aff't at ¶ 40).  Plaintiff had no objective weakness or numbness and his back pain was unrelated to his present groin pain.  *Id.*  The neurological assessment was neuropathy, likely from femoral nerve injury 2/2 local trauma on catheterization insertion.  *Id.*  Plaintiff was prescribed Gabapentin (300 mg) three times a day and a recommendation was made for medical boots.  *Id.*

**B.    Plaintiff's claims fail.**

Plaintiff's medical records refute his claims.  First, his medical records reveal that he is receiving abundant and appropriate care.  To the extent Plaintiff believes a faulty

catheterization procedure in June 2009 injured him, such an allegation of past harm does not constitute "impending harm" for purposes of § 1915(g).  Abdul-Akbar, 239 F.3d at 315.  Moreover, Plaintiff does not suggest that Defendants are presently denying him medical attention for his serious medical needs, and his medical records squarely refute any such inference as he is being seen routinely by both Chronic Care and specialty clinic personnel, and receiving medication.  The fact that Plaintiff disagrees with the course of treatment or desires different medication does not equate with imminent physical harm for purposes of § 1915(g).  He is monitored by medical staff and those professionals are addressing his needs.  There is no indication that Plaintiff is in any type of danger to excuse him from the § 1915(g) three-strikes bar.

## V.    Conclusion.

Plaintiff has lost the privilege of proceeding *in forma pauperis* and he has failed to demonstrate that he is in imminent danger of physical harm.  Accordingly, Plaintiff's application for leave to proceed i.f.p. (D.E. 2) is DENIED, the order conditionally granting i.f.p. is set aside (D.E. 10), and this action is dismissed without prejudice. Plaintiff may move to reinstate this action **within 60 days of this Order**, but only if the $400.00 filing fee is paid simultaneously with the motion to reinstate.  However, as noted above, Plaintiff has been duly advised of this Court's current opinion of his claims based on the record before it, and this is without considering Defendants' valid defenses, including the statute of limitations, lack of personal involvement, qualified immunity, and the like, and the Court's observation that Plaintiff would almost certainly obtain another "strike" should he proceed on these current claims.

ORDERED this 2nd day of May, 2014.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE